CHESTER KING, Plaintiff-Appellee, v. AMERICAN FOOD EQUIPMENT COMPANY, Defendant-Appellant and Third–Party Plaintiff-Appellant (Danielson Food Products, Inc., Third–Party Defendant-Appellee).

First District (2nd Division) Nos. 86—1725, 86—2059 cons.

Opinion filed September 1, 1987.

900

John G. Poust, Terrence E. Kiwala, Geoffrey Bryce, and Eric Boyd, all of Rooks, Pitts & Poust, of Chicago, for appellant.

Michael J. McArdle, of Michael J. McArdle, Chartered, of Chicago, for appellee.

JUSTICE BILANDIC delivered the opinion of the court:

Plaintiff, Chester King (King), filed this strict products liability action against defendant, American Food Equipment Co. (defendant), following an accident involving defendant's machine which amputated four of King's fingers. Defendant filed a third-party complaint against King's employer, Danielson Food Products, Inc. (Danielson Food).

After trial commenced, the trial court dismissed the third-party complaint against Danielson Food pursuant to Illinois Supreme Court Rule 219(c) as a sanction for discovery violations. (87 Ill. 2d R. 219(c).) The jury returned a verdict in King's favor and against defendant in the amount of $865,000. Defendant appeals.

The machine in question is a meat mixing and blending machine. The machine contains metal blades which cut the meat and then blend the cut meat with other ingredients. As there is no cover on the top of the machine, when looking into the machine the blades are observable to the operator. Two discharge chutes are located at the front of the machine toward the bottom. Warning signs placed over the chutes state: "DANGER—DO NOT PUT HANDS IN DOOR OPENINGS." When the meat is mixing, the discharge doors are closed. When mixing is completed, the operator opens the doors while the machine is still in operation. The blades discharge the meat through the discharge chutes into tubs placed beneath the door openings.

King was not a full-time operator of this mixer/blender. He was employed by Danielson Food as a delivery man outside of the plant but occasionally worked the machines in the plant after completing his deliveries. King testified that he had worked the mixer/blender a couple of times prior to the accident.

King testified that on March 20, 1978, the day of the accident, he

was helping Jim Crance, full-time operator of the mixer/blender, discharge the meat from the chutes. He testified that he took an empty tub and placed it under the discharge door. Because the tub did not fit properly under the door, it was necessary to slant the tub and position himself bent over so as to secure the tub. King stated that his attention was focused on the front of the machine and that he could not see over the top into the machine.

King testified that when the tub was full and no more meat was discharging, Crance indicated the machine was empty and that he would turn it off. Crance then moved his tub away, walked to the electrical controls and placed his hand on the control box. King testified: "I assumed that he had turned it off." King then saw a piece of meat hanging from the chute. When he reached in to pull it out, he felt a sharp pain, resulting in the amputation of four of his fingers.

King testified that he would not have put his hand there had he known the machine was still in operation. He stated that he was aware the machine could cause injury if he placed his hand there while the blades were in motion. However, since he could not hear the machine, feel any vibration, or see the blades rotating within the machine, he assumed it was safe.

Crance testified at trial that he did not recall telling King that he was going to shut the machine off. He stated that at the time of the accident, his back was to the control panel. However, Crance was then shown a statement he gave approximately five years earlier in which he stated that he thought he had his hand on the controls. He testified that he thought his memory was better then than at the time of trial.

King's expert, a consulting engineer, testified that the machine was unreasonably dangerous in seven respects: (1) it failed to provide a visual indicator that the machine was being powered; (2) it was not equipped with a guard in front of the discharge doors; (3) there is no reference in the instruction manual to guards; (4) if a guard were present, it should be interlocked to the power of the machine; (5) the guard, had it come with the machine, was difficult to mount as it was stainless steel; (6) it violated ANSI standards which require a guard with an interlocking device; and (7) the electrical control system did not contain any visual indication that power was being supplied to the machine. He further described the machine as relatively quiet and that one would have to go up to the machine to feel a vibration.

Valerio Baccetti, president of defendant corporation, testified that Danielson Food purchased the machine in late November 1977. He stated that in 1977, defendant was not selling the machine without a

guard and that it should have been sent with the machine. He assumed the machine was sent with the guard and four mounting pins because he inspected the machine the day before shipment and at that time it was complete. There was no witness to testify as to the condition of the machine immediately prior to shipment.

Rex Wharton, the salesman who sold the machine to Danielson Food, also testified. He was employed by T. W. Equipment, which had earlier successfully moved for summary judgment. He stated that when he sold the machine a guard was not mentioned. He testified that he was unaware that the machine had a guard and that there was no way for Danielson Food to know of this guard.

Danielson, Sr., president of Danielson Food, testified that no guard or mounting pins were received when the machine was shipped. He further testified that no operation or installation instructions were received. Seven to ten days after the accident, Danielson, Sr., apprised Wharton of King's injury and inquired whether there existed "some kind of safety measure" that would prevent a subsequent similar occurrence. Wharton and Danielson, Sr., telephoned the seller of defendant's machine and were informed that a guard could be manufactured.

Defendant subsequently shipped a guard to Danielson Food which arrived on April 17, 1978. However, no mounting pins were then received. After further inquiry to defendant regarding the proper mounting of the guard, Danielson Food received four steel mounting pins along with a letter dated July 7, 1978.

Proceedings in the case commenced on May 12, 1986. During the eighth day of testimony, the trial judge dismissed with prejudice the defendant's third-party action against Danielson Food as a sanction pursuant to Illinois Supreme Court Rule 219(c). (87 Ill 2d R. 219(c).) This sanction was entered against defendant for what the court described as defendant's "gross violation of the discovery rules." Defendant later filed a motion to vacate the trial court's dismissal of its third-party complaint against Danielson Food. After extensive oral argument, the trial court denied defendant's motion to vacate. The court also denied defendant's subsequent motion for a mistrial as a result of the Danielson Food dismissal and entered a final order dismissing defendant's third-party action.

Relevant to the dismissal is a notice and subpoena for record production which was served upon Danielson Food in August 1979, prior to its becoming a third-party defendant. The notice stated: "This deposition is for records only. There will be no oral interrogation." Rather than submitting the documents and a notarized affidavit by

mail, Danielson Food responded to the subpoena by having its president, Danielson, Sr., appear at the offices of defendant's attorneys on August 20, 1979. Counsel for King did not attend because the subpoena explicitly stated on its face that only production of records was involved and no oral testimony would be taken. However, Danielson, Sr., was questioned without the benefit of counsel despite that representation embodied in the subpoena and was asked to sign the statement elicited and transcribed.

As reflected by that statement, Danielson, Sr., in response to the subpoena, produced "three time record cards, one stainless steel stud, one letter dated 7/7/78, one purchase order dated 11/11/77 and one blueprint dated 12/21/77." Danielson, Sr., stated that the "stainless steel stud" (hereinafter referred to as the "mounting pin") produced was one of the four mounting pins first shipped by defendant to Danielson Food on July 7, 1978, subsequent to King's injury. Danielson, Sr., did produce the mounting pin for inspection by defendant's attorneys but retained possession of the mounting pin because it was needed to mount the guard on the machine.

Meanwhile, King's counsel had requested defendant to furnish all documents produced by Danielson Food. On December 12, 1979, defendant responded with an invoice for copying charges, itemizing 14 pages of records. The 14 pages ultimately provided to King's counsel did not include the five-page handwritten statement that had been elicited from Danielson, Sr. Further, the invoice for copying charges made no mention of the statement.

On December 6, 1984, during the deposition of Danielson, Sr., counsel for Danielson Food specifically inquired as to whether counsel for any of the other parties possessed any statements made by Danielson, Sr. In response to this inquiry, defendant's attorneys denied possessing any statements.

On May 8, 1986, just prior to the commencement of trial, Danielson Food served upon defendant a notice to produce pursuant to Illinois Supreme Court Rule 237. (87 Ill. 2d R. 237.) This notice set forth Danielson Food's request for all documentary material relevant to this cause of action. In addition, the notice specifically requested:

> "12. Any and all drawings, models, demonstrative exhibits, photographs, standards, tangible objects or other material that may be used in the trial of this cause for demonstrative or other purposes."

On May 12, 1986, prior to impaneling the jury, the trial judge reviewed all parties' compliance with outstanding discovery requests. Moreover, the trial judge specifically requested all parties to identify

any demonstrative evidence and tangible exhibits that would be utilized at trial. In response, defendant's attorneys stated that compliance with Rule 237 production requests was complete and that with the exception of three enlargements, no demonstrative evidence or tangible exhibits would be introduced. The jury was then impaneled, and all parties made opening statements setting forth their respective theories of the case and their anticipated evidence.

On May 14, 1986, defendant's attorneys produced for the first time a copy of an invoice for shipping charges pertaining to a purported safety guard. The invoice inferred that the guard and mounting pins had been shipped to Danielson Food in March 1978, prior to the accident. The previous production notices however, clearly had requested any and all documentation pertaining to the machine. Defendant's attorneys stated that this document had been suddenly discovered on May 13, 1986. Accordingly, both counsel for Danielson Food and King objected to defendant's use of this document. The trial court ruled that the production of this document on the third day of trial was highly prejudicial and that this sudden discovery violated both the letter and spirit of discovery rules and procedures. Thus, the trial court ruled the document inadmissible.

On May 23, 1986, 11 days into trial, Danielson, Sr., was called by defendant to testify. He was questioned regarding his previous testimony that no guard, mounting pins, drawing, or instruction manual was received by Danielson Food with the machine when it arrived at the plant. He testified that the only guard the company ever received was received on April 17, 1978, subsequent to the accident, and that the mounting pins were not received until a time after July 7, 1978.

Immediately following this testimony, defendant questioned Danielson, Sr., as to whether, pursuant to the subpoena for record production served in August 1979, he had "produced a fifth pin." This question implied that Danielson Food had, in fact, received more than one set of four mounting pins and had simply failed to mount the safety guard. Danielson, Sr., responded that he had never produced a "fifth pin" to defendant's attorneys. Defendant then marked as an exhibit the statement that had been elicited from Danielson, Sr., pursuant to the supposed "records only deposition" and questioned Danielson, Sr., about its contents. At this point, Danielson Food requested a sidebar outside the presence of the jury for the purpose of objecting to the introduction of evidence relating to any so-called "fifth pin."

During an in-chambers hearing, counsel for Danielson Food and King informed the trial court that until that moment, neither had

ever seen this "fifth pin," nor had they been apprised of its existence in defendant's files. Defendant alleged that the "fifth pin" had been produced by Danielson, Sr., pursuant to the subpoena for record production and that possession of this pin had been surrendered by Danielson, Sr., at that time. As counsel for Danielson Food informed the trial court on May 23, 1986: "I state absolutely unequivocally for the record that I never saw that pin, never heard of that pin, never even knew that pin existed *** until we walked into this room this morning."

Danielson Food then moved to dismiss defendant's third-party complaint against them as a result of defendant's discovery violations. After carefully reviewing the record and entertaining arguments by all parties, the trial court granted Danielson Food's motion to dismiss. The trial court characterized defendant's conduct with regard to this alleged "fifth pin" as a "gross violation of the discovery rules." The trial court concluded that defendant's "abuse of the rules" in failing to produce this critical piece of physical evidence in response to Danielson Food's Rule 237 notice to produce fundamentally affected and prejudiced both Danielson Food and King and justified the severity of the sanctions entered against defendant. The court reasoned that defendant's conduct thoroughly and completely contravened and undermined the principles of openness and fairness and full disclosure that underlie the discovery rules. The trial judge expressly stated that he had imposed the sanction pursuant to Illinois Supreme Court Rule 219(c) as a result of the "cumulative" prejudicial effect of defendant's discovery violations.

The trial of the action between King and defendant proceeded and on May 28, 1986, the jury returned a verdict in favor of King and against defendant in the amount of $865,000. Defendant filed a posttrial motion requesting judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court denied defendant's posttrial motion. On appeal, defendant alleges numerous trial court errors as well as an improper dismissal of Danielson Food as a discovery sanction pursuant to Supreme Court Rule 219(c).

## I

Defendant asserts that the trial court erred in withdrawing from the jury the defense of assumption of risk. In *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305, the court stated that a plaintiff who knows a product is in a dangerous condition and proceeds in disregard of this known danger may not recover for resulting injuries. The court emphasized that assumption of

risk is an affirmative defense. The test for determining whether a user has assumed the risk of using a product known to be dangerously defective is fundamentally a subjective test in the sense that it is his knowledge, understanding and appreciation of the danger which must be assessed, rather than that of the reasonably prudent person. (45 Ill. 2d 418, 430, 261 N.E.2d 305.) Thus, a plaintiff assumes the risk of a defective product only if he is actually aware of the defective nature of the product and appreciates its unreasonably dangerous character, but nonetheless chooses voluntarily to act in disregard of such known danger. (*Thomas v. Kaiser Agricultural Chemicals* (1980), 81 Ill. 2d 206, 213, 407 N.E.2d 32.) It is the burden of the defendant to prove that the user deliberately decided to encounter a known risk, or was willing to take a chance. (*Derrick v. Yoder Co.* (1980), 88 Ill. App. 3d 864, 870, 410 N.E.2d 1030, *appeal denied,* (1981), 82 Ill. 2d 584.) Thus, a consumer's unobservant, unattentive, ignorant or awkward failure to discover or guard against the defect should not be compared as a damage-reducing factor. *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 119, 454 N.E.2d 197.

■ Viewing the evidence in the light most favorable to the defendant, the trial court found that the evidence so overwhelmingly favored the plaintiff that a jury finding for defendant on the issue of assumption of risk could never stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) We find that the trial court properly directed a verdict for plaintiff on the assumption of risk defense in that there was no evidence that King deliberately proceeded in disregard of a known dangerous condition.

The totality of the evidence demonstrates that King believed the machine was turned off. King testified that he knew the machine could cause injury if he placed his hand inside when the blades were in motion. However, he stated that it was his perception, via Crance's actions, that the machine was turned off. King specifically denied that he assumed the risk of his own injury by not taking adequate precautions to be sure that the power was off.

Crance's testimony, although undeniably equivocal, supports this belief. Crance stated that the mixing process was complete, meat had stopped discharging from the chutes, and the tubs had been placed flat on the floor. His written statement, taken five years prior to trial, stated that his hand was on the control box at the time of the incident. Although his trial testimony differed from his written statement, he testified that his written statement more accurately represented his memory of the events.

In addition, during King's testimony, King was permitted to leave

the witness stand and before the court and jury demonstrate, with the actual tub that was in use at the time, the manner in which he straddled the tub in a crouched position and guided the meat product into the tub. It was evident to the court and jury that King's eye level and field of vision would have precluded him from seeing into the mixer or visualize the blades while straddling the tub.

No evidence was presented to prove that King "deliberately decided to encounter a known risk." Therefore, as defendant failed to satisfy its burden of proof, it was proper for the trial court to strike the assumption of risk defense.

## II

Defendant also asserts that the trial court erred in finding as a matter of law that King did not misuse the mixer/blender by ignoring the warnings.

Misuse is the use of a product "for a purpose neither intended nor 'foreseeable' (objectively reasonable) by the defendant" and may defeat a cause of action. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 425, 261 N.E.2d 305.) Although the question of foreseeability is normally a question for the jury, the standard applicable to the trial court's ruling is, in viewing the evidence most favorably to the defendant, does it so overwhelmingly favor the plaintiff that no contrary verdict could ever stand on the issue of misuse? (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) The trial court found that it was foreseeable that one might place his hand in the discharge chute. We find that the trial court acted properly in striking this defense, as there is no evidence that King used the machine for a purpose that was neither intended nor reasonably foreseeable.

During the trial, the president of defendant corporation testified that the machine is not dangerous when it is not being powered. He stated that when the machine is off, there is nothing wrong with putting one's hand inside. In fact, testimony was presented that workers will put their hands into the machine in order to clean it. The president further testified that the purpose of the guard was to prevent a worker from putting his hands into the machine when it was in operation. It is clear from that testimony that such was a possibility, otherwise a guard would be pointless. Therefore, in light of the president's own testimony regarding the foreseeability of a worker putting his hand into the machine, the trial court acted properly in striking the misuse defense.

## III

■ Defendant contends that the trial court committed reversible error by dismissing its third-party action against Danielson Food Products pursuant to Supreme Court Rule 219(c) as a sanction for defendant's repeated violations of discovery rules. 87 Ill. 2d R. 219(c).

Illinois courts have long recognized that the purposes of litigation are best and most effectively served when each party knows as much about the controversy as is reasonably practicable. The objectives of discovery are to enhance this truth-seeking process, making good-faith compliance with discovery rules both desirable and necessary. (*Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 282, 433 N.E.2d 253.) The discovery rules were promulgated to enable attorneys to effectively prepare, evaluate, and present their cases and to eliminate surprises so that judgments will rest upon the merits of a cause of action and not upon the maneuvering of counsel. See *McCabe v. Department of Registration & Education* (1980), 90 Ill. App. 3d 1123, 1131, 413 N.E.2d 1353, *cert. denied* (1981), 454 U.S. 838, 70 L. Ed. 2d 119, 102 S. Ct. 143.

The discovery rules establish guidelines for a fair and orderly procedure by which discovery and full disclosure may be accomplished. The rules authorize the imposition of sanctions upon a party deemed by the trial court to have abused or disregarded discovery rules and procedures. (See *Bruske v. Arnold* (1968), 100 Ill. App. 2d 428, 433, 241 N.E.2d 191, *aff'd* (1969), 44 Ill. 2d 132, 254 N.E.2d 453, *cert. denied* (1970), 398 U.S. 905, 26 L. Ed. 2d 65, 90 S. Ct. 1697.) Supreme Court Rule 219(c) provides that if a party fails to comply with a discovery rule or an order entered under the discovery rules, the trial court may impose sanctions for that failure. Specifically, Supreme Court Rule 219(c) provides in pertinent part:

> "If a party, * * * unreasonably refuses to comply with any provision of Rules 201 through 218, or fails to comply with any order entered under these rules, the court, on motion, may enter, in addition to remedies elsewhere specifically provided, such orders as are just, including, among others, the following:
>
> * * *
>
> (v) that, as to claims or defenses asserted in any pleading to which that issue is material, a judgment by default be entered against the offending party or that his action be dismissed with or without prejudice * * *." (87 Ill. 2d R. 219(c).)

Illinois Supreme Court Rule 237(b) provides in pertinent part:

> "The appearance at the trial of a party or a person who at the time of trial is an officer, director, or employee of a party

may be required by serving the party with a notice designating the person who is required to appear. The notice also may require the production at the trial of documents or tangible things. *** Upon a failure to comply with the notice, the court may enter any order that is just, including any order provided for in Rule 219(c) that may be appropriate." 87 Ill. 2d R. 237(b).

■■ The standard utilized by courts in determining whether a party's conduct is unreasonable is whether "the conduct of the offending party seems to have been characterized by a deliberate and pronounced disregard for the rule or order not complied with" or whether "the actions of the party show a deliberate, contumacious or unwarranted disregard of the court's authority." (*612 North Michigan Avenue Building Corp. v. Factsystem, Inc.* (1975), 34 Ill. App. 3d 922, 926, 340 N.E.2d 678, *appeal after remand* (1977), 54 Ill. App. 3d 749, 370 N.E.2d 236.) The appropriate sanction for a party's noncompliance with discovery rules is a matter within the trial judge's broad discretion. The trial court's exercise of discretion will not be disturbed on appeal unless an abuse is present. (*In re Estate of Soderholm* (1984), 127 Ill. App. 3d 871, 879, 469 N.E.2d 410.) As this court has repeatedly held, a reviewing court should not substitute its discretion for that of the trial court. An abuse of discretion may be found "only where no reasonable man would take the view adopted by the trial court." *In re Marriage of Asch* (1981), 100 Ill. App. 3d 293, 296, 426 N.E.2d 1066.

■■ ■ An analysis of the factors previously utilized by this court to determine the propriety of discovery sanctions entered by a trial court pursuant to Supreme Court Rule 219(c) makes quite clear the propriety of the sanctions imposed by the trial court. Factors considered in determining whether a party's noncompliance with discovery rules is unreasonable include: (1) the surprise of the opposing party; (2) the prejudicial effect of the testimony; (3) diligence of the opposing party in seeking discovery; (4) the timely objection to the testimony; and (5) the good faith of the party offering the evidence or testimony. (*Carlson v. General Motors Corp.* (1972), 9 Ill. App. 3d 606, 619-20, 289 N.E.2d 439.) The record in this case fully supports the trial court's finding in light of these factors and reveals a pronounced pattern of deliberate and blatant disregard of discovery rules.

At the commencement of the trial, the trial judge proceeded through a detailed checklist reviewing all discovery undertaken by the parties. The trial court explicitly asked all counsel whether any discovery matters remained outstanding and whether any counsel in-

tended to use documentary materials or tangible objects, not yet produced, at trial. In response to that direct inquiry, counsel for defendant informed the trial court that compliance with Rule 237 production requests was complete and that, with the exception of three enlargements, no demonstrative evidence or tangible objects would be introduced.

On the third day of trial, counsel for defendant first produced a purported shipping invoice for a replacement guard. This invoice had never been previously disclosed or produced to any party pursuant to discovery. In response to objections by King and Danielson Food, the trial court barred the use of this evidence before the jury.

Nine days later, after King had rested and defendant began its case, counsel for defendant attempted to surprise the president of Danielson Food by producing a purported "fifth" mounting pin on which a safety guard for the machine at issue was to have been mounted. The "fifth" pin had never been identified during discovery and was not identified in response to the trial court's inquiry regarding demonstrative evidence prior to *voir dire*.

The legal theory advanced by Danielson Food throughout the trial was that Danielson Food never received the guard or mounting pins before the accident. Therefore, the unexplained and unanticipated appearance of this invoice and alleged "fifth pin" was in direct contravention of the fair and complete discovery practices advocated by the supreme court and this court.

Further, at the time this alleged "fifth pin" was purportedly produced to defendant, defendant was to be conducting what was represented as a records only deposition with no oral interrogation. Despite this representation, defendant elicited a written statement from Danielson, Sr., without his having benefit of counsel.

The foregoing clearly illustrates that the trial court's dismissal of defendant's third-party claim against Danielson Food constituted an appropriate and necessary sanction, well within the trial court's discretion. As the trial court stated, defendant's conduct with regard to the alleged "fifth pin" was a "gross violation of the discovery rules." The trial court determined that defendant's "abuse of the rules" in failing to produce this critical piece of evidence until the eighth day of trial fundamentally prejudiced both Danielson Food and King and warranted the sanctions imposed. In imposing the sanction, the trial court weighed the prejudice resulting from defendant's additional discovery violations throughout the course of the litigation.

In view of the ample evidence set forth in the record, defendant has failed to establish any basis for a finding that "no reasonable man

would take the view adopted by the trial court." (*In re Marriage of Asch* (1981), 100 Ill. App. 3d 293, 296, 426 N.E.2d 1066.) Thus, the trial court's dismissal of the third-party action pursuant to Supreme Court Rule 219(c) will not be disturbed.

King alleges, however, that as a further sanction, he should be awarded monetary damages for defendant's failure to comply with discovery. King filed his own motion for appropriate sanctions alleging that he did not benefit from the Danielson Food dismissal. The trial court, however, denied the motion because it felt that the dismissal was a severe enough sanction against defendant.

Imposing sanctions, and what sanctions to utilize, for unreasonable failure to comply with discovery orders or rules is within the trial court's discretion. (*Ferenbach v. DeSyllas* (1977), 45 Ill. App. 3d 599, 603, 359 N.E.2d 1214.) Discovery sanctions are to be used by the trial court to accomplish the objectives of discovery and must not be used simply to penalize a party. *Gallo v. Henke* (1982), 107 Ill. App. 3d 21, 27, 436 N.E.2d 1068.

In view of the trial court's determination as to the dismissal of Danielson, further sanctions against defendant are not justified.

IV

Defendant also alleges error in various trial rulings regarding the examination of witnesses. These include denying defendant's request to examine certain witnesses as adverse witnesses and the limiting of cross-examination.

It is well established that rulings such as these are committed to the sound discretion of the trial court. Such rulings will not be reversed without a clear abuse of discretion resulting in manifest prejudice to the defendant. (*Chew v. Graham* (1984), 122 Ill. App. 3d 461, 463-64, 461 N.E.2d 574.) Upon thorough review of the record, we find that the trial court did not abuse its discretion with resulting prejudice to defendant and therefore, these rulings will not be overturned.

V

Defendant also alleges error resulting from several jury instructions. First, defendant argues that the trial court erred in refusing its instruction regarding the sole proximate cause of the injury's being that of the employer, Danielson Food. This paragraph should only be used when there is evidence tending to show that the sole proximate cause for the occurrence was the conduct of a third person. (Illinois Pattern Jury Instructions, Civil, No. 12.04, at 75 (2d ed 1971).) However, it is settled that in a strict products liability action,

the plaintiff need only prove that the condition of the product was "a" proximate cause of the injury. (*Soto v. E. W. Bliss Division of Gulf & Western Manufacturing Co.* (1983), 116 Ill. App. 3d 880, 893, 452 N.E.2d 572, *appeal denied* (1983), 96 Ill. 2d 565.) Therefore, error, if any, by the trial court in not tendering the sole proximate cause instruction was harmless error since the jury obviously found defendant to be "a" proximate cause.

▆▆ Defendant next maintains that the court erroneously gave plaintiff's instruction regarding defendant's failure to call a witness which stated that where a party fails to produce a witness within his power to produce, the jury may infer that the testimony of the witness would be adverse to that party. The giving of this instruction rests within the sound discretion of the trial court and will be reversed only where a clear abuse of discretion has been shown. (*Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 460 N.E.2d 464, *appeal denied* (1984), 101 Ill. 2d 551.) Before giving the instruction, the court must first determine that a party would in all likelihood produce the witness under the facts and circumstances unless his testimony would be unfavorable. *Feigl v. Terminal R.R. Association* (1975), 30 Ill. App. 3d 55, 62, 332 N.E.2d 416, *appeal denied* (1975), 61 Ill. 2d 597.

▆▆ In the instant case, the witness not produced was that employee who checked the machine just prior to shipment to determine if it contained the proper guard, mounting pins and instruction manual. This information was vital, since defendant sought vigorously to give the jury the impression that the machine sold to Danielson was shipped with these items. Therefore, we cannot say that the trial court's decision to give the instruction regarding the absence of the witness was a clear abuse of discretion requiring reversal of the jury's verdict. See *Donnelly v. Washington National Insurance Co.* (1985), 136 Ill. App. 3d 78, 88, 482 N.E.2d 424, *appeal denied* (1985), 111 Ill. 2d 554.

▆▆ Defendant also maintains that the trial court erroneously instructed the jury regarding approved standards of the American National Standards Institute. The instruction read as follows:

"At the time that the AFECO 510 Mixer/Blender left the control of AFECO, the American Society of Mechanical Engineers and the American National Standards Institute had approved ANSI Standard F2.1 which in part, states:

All machines shall be designed and employ materials of construction and a degree of workmanship which will provide adequate health and safety protection for personnel. If the

normal operation of a machine involves accident hazards, suitable protection shall be provided. All guards or covers which enclose hazardous moving parts and which must be opened during normal operation shall be provided with an interlocking device which prevents the machine from being operated when the cover or guard is open or removed.

If you decide that AFECO failed to comply with this standard you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not the AFECO 510 Mixer/Blender was unreasonably dangerous."

Standards may be relevant in a product liability action to determine whether a condition is unreasonably dangerous. Moreover, evidence of standards may be relevant and admissible even though the standards have not been imposed by statute or promulgated by a regulatory body and therefore, do not have the force of law. *Ruffiner v. Material Service Corp.* (1987), 116 Ill. 2d 53, 58.

■■ In the instant case, the jury was not instructed that it was required to follow the ANSI standard, but only that if it found a violation, it could consider that along with all the other evidence. Therefore, the court properly instructed the jury regarding the ANSI standards.

## VI

■■ Defendant maintains that the court erred in denying its motion for judgment notwithstanding the verdict on the ground that the sole proximate cause of the accident was Danielson's failure to instruct and that King misused the mixer/blender.

Judgments *n.o.v.* are proper only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 509-10, 229 N.E.2d 504.) In light of the foregoing discussion regarding these issues, defendant was not entitled to judgment *n.o.v.* based on misuse and sole proximate cause.

Defendant further contends that the jury verdict was excessive and a remittitur should be granted. The jury returned a verdict of $865,000.

■■ The test for an excessive verdict is whether it falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 1030, 343 N.E.2d 65, *appeal denied* (1976), 63 Ill. 2d 552.) The propriety of an

award of damages for personal injuries is not subject to mathematical computation, nor may it be measured by comparison with verdicts in other cases. Rather, each verdict for a personal injury must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury and the ruling of the trial judge on the post trial motions. *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 453, 158 N.E.2d 63, *cert. denied and appeal dismissed* (1959), 361 U.S. 127, 4 L. Ed. 2d 180, 80 S. Ct. 256.

 The damages awarded here were properly supported by the evidence. The jury heard evidence concerning King's operations reimplanting and then reamputating his fingers. They heard of the failed attempt to obtain a prosthesis. The jury also heard King testify about the indescribable pain at the time of the accident, his current sensitivity and "phantom pain." In addition, King testified how the injury affects his normal activities, such as showering and shaving. The jury felt that $865,000 would compensate King and that sum does not shock this court's conscience.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS and HARTMAN, JJ., concur.